Paulina CASTILLO, et al.,
Plaintiffs-Appellants,

v.

Ercell GIVENS, Defendant-Appellee.

No. 81–1520.

United States Court of Appeals,
Fifth Circuit.

May 6, 1983.
Rehearing Denied June 16, 1983.

Edward J. Tuddenham, Tex. Rural Legal Aid, Inc., Farm Worker Div., Hereford, Tex., for plaintiffs-appellants.

Beate Bloch, Assoc. Sol., Sandra D. Lord, U.S. Dept. of Labor, Washington, D.C., amicus curiae.

Crenshaw, Dupree & Milam, Tom S. Milam, Lubbock, Tex., for defendant-appellee.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiffs, thirty-nine Mexican and Mexican-American migrant farm laborers who chopped cotton in defendant's fields during the summers of 1977 and 1978, brought this action under section 216(b) of the Fair Labor Standards Act (FLSA) for unpaid minimum wages and liquidated damages and under section 2050a of the Farm Labor Contractor Registration Act (FLCRA) for liquidated damages. The district court entered judgment for defendant on both claims, based on the jury's answers to nine special issues. Plaintiffs appeal from the court's denial of their motions for judgment n.o.v. and alternatively for a new trial. With regard to the FLSA claim, this Court reverses and remands for a new trial on the number of hours worked by the individual plaintiffs and for a finding by the Court as to an award of liquidated damages.[1] With regard to the FLCRA claim, this Court reverses and remands for a determination of the number of violations committed and the award of liquidated damages in an amount of up to $500 per violation.

## I. Facts

Defendant Ercell Givens, President of the First State Bank of Abernathy for twenty-six years, owned a farm of approximately 4000 acres, of which about 1800 acres in 1977 and 2000 acres in 1978 were devoted to cotton production. Defendant employed five fulltime "hands" to run his farm as well as seasonal temporary hands to perform jobs such as operating tractors and feeding cattle. Defendant himself made the decisions of when and where to prepare the fields, when to plough, when to plant, when to cultivate, and when to harvest. In order to produce a good cotton crop, cotton should be chopped in the summertime[2] —the job simply involves chopping or hoeing the weeds out of the rows of growing cotton. It is a menial, unskilled task which requires no aptitude, no training, and no ability to reason. It is a work of drudgery

---

1. The district court has discretion in whether to award liquidated damages and, if it does, in the amount of the award if the court determines that the defendant's failure to pay minimum wage was in good faith and that he had reasonable grounds to believe that his failure to pay minimum wage was not a violation of the FLSA:

> In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260 (1975).

This Court has interpreted the statutory language as follows:

> Section 11 of the Portal-to-Portal Act [29 U.S.C. § 260], imposes upon an employer seeking to escape liquidated damages the plain and substantial burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict."

*Reeves v. International Telephone & Telegraph Corp.*, 616 F.2d 1342, 1352 (5th Cir.1980) [citing *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468 (5th Cir.1979)]. In discussing the "reasonable good faith" requirement, this Court made the following statements:

> [W]e also doubt the validity of ignorance as a defense to liability for liquidated damages under Section 11. We do not believe an employer may rely on ignorance alone as reasonable grounds for believing that its actions were not in violation of the Act. Further, we feel that good faith requires some duty to investigate potential liability under the FLSA. Even inexperienced businessmen cannot claim good faith when they blindly operate a business without making any investigation as to their responsibilities under the labor laws. Apathetic ignorance is never the basis of a reasonable belief.

*Barcellona*, 597 F.2d at 468–69.

A successful showing by defendant under 29 U.S.C. § 260 does not preclude the award of liquidated damages. Under the language of the statute, even if the court determines that defendant has met the "reasonable good faith" requirement, the court nonetheless has discretion to award liquidated damages.

2. The cotton chopping season in the area involved runs from around June 20 to mid-August.

which can be performed by persons ranging from very young to quite old; it is accomplished with a simple instrument—the hoe. Defendant employed Manuel Tonche to furnish him with a crew of field workers and to chop his cotton.[3] Defendant knew that Tonche was registered with the Department of Labor (DOL) as a farm labor contractor, and defendant required Tonche to show him his identification card from the DOL at the beginning of each season. Tonche, an illiterate with only a second-grade education who "junked" cars (cut up the bodies and sold the metal as scrap iron) in the winter, worked only for the defendant. In search of field work, the workers contacted Tonche. Tonche provided transportation to the fields for most of the workers in his used school bus, but some came in their own vans or pickups. Tonche's son brought the hoes to the fields in his pickup.

Tonche provided defendant with workers to chop his cotton for four years ending in 1978.[4] The crew varied in size, ranging from around thirty or forty up to fifty persons on any one day. In addition to Tonche's crew, defendant also hired the wives, children, and friends of his fulltime hands to chop cotton. Although defendant always paid his bank employees minimum wage, he paid his cotton choppers, including Tonche, $1.65 an hour in 1977 and $1.75 an hour in 1978. The minimum wage was $2.20 an hour in 1977 and $2.65 an hour in 1978. Although defendant was aware of the minimum wage law and the amount of the minimum wage in 1977 and 1978, he stated that he did not realize that the law required him to pay minimum wage to his farm workers as well as to his bank employees.

On each Friday, defendant would give Tonche a check based on the number of hands and the number of hours Tonche reported to him had been worked. Tonche would then mete out the wages to the individual workers in cash. Tonche kept track of the number of hands and the number of hours worked on a daily basis and brought these figures to defendant on a piece of a paper sack.[5] Defendant would then copy Tonche's figures into his own record book. Significantly, defendant did not keep any further records other than his cancelled paychecks to Tonche. In particular, defendant did not keep any records of the individual plaintiffs' names, their hours of work, or their wages.

Both the exigencies of running a farm and his serving as bank president prevented defendant from physically supervising the work of his farm employees at all times. Nevertheless, defendant went to the fields three or four times a week to make sure the workers were in the right fields (his fields), to check up on the number of hands working, and to make sure how his entire farming operation was progressing. It was defendant who made the decision on when to start chopping in the season, on which fields to chop, and in what order the fields were to be chopped. Moreover, defendant directed Tonche which weeds were to be chopped and which weeds were not to be chopped; defendant determined when a job was finished.

In September 1978, the DOL investigated defendant's farming operation and determined that defendant owed back FLSA minimum wages to nine members of Tonche's crew who chopped cotton in defendant's fields in 1977 and 1978; defendant paid those nine workers. The DOL also investigated defendant for violations of the FLCRA; defendant was advised by letter in March 1979 that the DOL was not contemplating any further action on the violations indicated. In addition to Tonche, the

---

**3.** Although defendant claims that he "contracted with" Tonche only to chop his cotton—not to furnish him with cotton choppers—defendant admitted at trial that Tonche could not chop the cotton on a 2000-acre farm all by himself.

**4.** Plaintiffs ask for unpaid minimum wages for the years 1977 and 1978.

**5.** Tonche, with the help of his own children, kept a notebook of the individual workers' names (many were listed by nickname) and the number of hours they worked. The names and figures were often but not always transcribed into this notebook from loose pieces of paper where Tonche, his son, or daughter had written them while in the fields.

plaintiffs who filed the instant action on February 14, 1980,[6] were members of Tonche's crew who did not receive back minimum wages.[7]

The case was tried to a jury. At the close of all the evidence, plaintiffs moved for a directed verdict on all issues except the calculation of the number of hours of work performed by plaintiffs. The jury found against plaintiffs on each of nine special issues submitted to it.[8] On June 19, 1981, the court entered judgment for defendant on both claims. Plaintiffs moved for judgment n.o.v. with respect to all issues and alternatively for a new trial with regard to the hours they worked. In an order of October 7, 1981, the court denied both the motion for judgment n.o.v. and the motion for a new trial. With respect to the FLSA claim, the court concluded that the jury's finding that plaintiffs were not engaged in the production of goods for commerce was not supported by the evidence. The court stated, however, that the jury could have reasonably found that defendant was not plaintiffs' employer. With respect to the FLCRA claim, the court held that the jury's finding that plaintiffs were not migrant laborers was not supported by the evidence. Nevertheless, the court stated that the jury could have reasonably found that Tonche was not a farm labor contractor. Plaintiffs appeal from this order.

## II. *FLSA Claim*

The issues this Court must address concerning the FLSA claim relate to the status of plaintiffs vis-a-vis defendant, the willfulness of any violation of section 16(b), and the number of hours plaintiffs worked.

### A. *Plaintiffs' Status*

#### 1. *A Question of Law*

■ This Court has repeatedly held that the ultimate conclusion that an individual is an "employee" within the meaning of the FLSA is a legal determination rather than a factual one.[9] Most recently, in *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662 at 666 (5th Cir.1983), this Court dealt directly with the standard of review for the determination of employee status:

> We review the district court's determination [that the plaintiff welders are employees within the meaning of the FLSA] as being one of mixed law and fact. (citation omitted). As to the trial court's underlying factual findings and factual inferences deduced therefrom, we are bound by the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure. *Id.* However, as to the legal conclusion reached by the district court based upon this factual data, *i.e.*, here that these welders are employees rather than independent contractors, we may review this as an issue of law.

Prior to *Robicheaux*, this Court had occasion to address the standard of review for the "employee" status determination in *Donovan v. American Airlines, Inc.*, 686 F.2d

---

6. These plaintiffs include those who were later added by filing a written consent.

7. Tonche, who was not a plaintiff under the FLCRA claim, died at the age of fifty-six before the trial began on June 15, 1981. Tonche's wife was substituted as his representative.

8. In response to the special issues relating to the FLSA claim, the jury found that (1) plaintiffs were not engaged in the production of goods for commerce, (2) plaintiffs were not employees of defendant, and (3) defendant's failure to pay the minimum wage was not willful in 1977 or in 1978. Special Issues 4 and 5 related to the number of hours the individual plaintiffs worked in 1977 and 1978. On the FLCRA claim the jury found that (1) plaintiffs were not migrant workers; (2) Tonche was not

a farm labor contractor; (3) defendant did not fail to maintain payroll records of the individual plaintiffs showing all of the following information: total earnings in each payroll period, all withholdings from wages, net earnings, number of units of time employed, rate per unit of time, a statement of all sums paid to Tonche on account of the labor of the worker, a statement of all sums withheld by Tonche from the amount he received on account of the worker, and the purpose of the above withholding; (4) any failure of defendant to comply with the FLCRA was not willful.

9. Any subsidiary factual issues leading to this conclusion are, of course, questions of fact for the jury.

267 (5th Cir.1982). There, this Court stated:

> The standard of review of the district court's decision is that of a legal, and not a factual, determination. Thus, although we are bound by the clearly erroneous standard in reviewing the individual findings of fact leading to the district court's conclusions, we review the determination that the students here were not employees as we review any determination of law.

(citations omitted). The *American Airlines* holding is in accord with this Court's opinion in *Donovan v. Tehco,* 642 F.2d 141, 143 n. 4 (5th Cir.1981) where we stated:

> In reviewing the district court's ultimate findings that the workers at issue were independent contractors, we are not constrained by the "clearly erroneous" standard. Rather, these ultimate findings are treated as legal determinations.

*Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 n. 4 (5th Cir.1981). Prior to the *Tehco* decision, this Court in *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1189 n. 11 (5th Cir.1979), had stated:

> In reviewing the Trial Court's ultimate finding that Weisel was not an employee, we are not constrained by the "clearly erroneous" test. Rather, that finding is treated as a legal determination. (citation omitted). However, the individual findings of fact leading to that conclusion are examined under the "clearly erroneous" test. *See Mitchell v. Strickland Transportation Co.,* 228 F.2d 124, 126 (5th Cir.1955).

The initial decision of this Circuit holding that the employee/independent contractor status determination is a legal one was *Shultz v. Hinojoso,* 432 F.2d 259 (5th Cir. 1970). In *Shultz,* this Court stated:

**10.** The Eleventh Circuit has also held that the issue of employee status is a legal one which is not subject to the clearly erroneous standard of review, but that the individual findings of fact which lead to that legal determination must be examined under the clearly erroneous standard. *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 471 n. 4 (11th Cir.1982).

There is no dispute as to the basic facts relating to the engagement of Jiminez for the performance of the cleanup work after he finished his day's work as a slaughterer. The trial court's determination that these facts created the relationship of an independent contractor ... is not a finding of fact which is bolstered by the clearly erroneous rule when reviewed by this court. In the early case of *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772, the Supreme Court as well as the Court of Appeals for the Tenth Circuit, *Walling v. Rutherford Food Corp.,* 156 F.2d 513 [10th Cir.], treated such a finding as being subject to review as a matter of law, notwithstanding an elaborate disagreement on this point by Judge Phillips in the Court of Appeals. *See* 156 F.2d 513 at page 517. It is clear that the definition of employment, as used in the Fair Labor Standards Act, is "the broadest definition that has ever been included in one act."

*Id.* at 264.[10]

Although the above-mentioned cases were tried to the Court rather than to a jury, there is no basis to differentiate between a jury and a nonjury case regarding the status of an employee determination as legal or factual. The substantive provisions of the Act at issue—violations of minimum wage, overtime, and record keeping provisions—are the same in both jury and nonjury cases. If the employee/independent contractor determination is a legal one in a case tried to the court, it must also be a legal one in a case tried to a jury. Indeed, *Robicheaux,* although tried to the court, was a section 216(b) suit in which the plaintiff-welders were entitled to a jury trial.[11]

**11.** The FLSA establishes three separate statutory causes of action: (1) under Section 16(b), 29 U.S.C. § 216(b), an employee may sue his employer for unpaid overtime compensation, unpaid minimum wages, and an additional equal amount in liquidated damages; (2) under Section 16(c) the Secretary may sue on behalf of an employee or employees to recover unpaid overtime, unpaid minimum wages, and an additional equal amount

A plaintiff's decision to exercise his right to a jury trial does not change the standard of review to be applied by this Court.[12]

> as liquidated damages; and (3) under Section 17 the Secretary may seek to enjoin violations of the FLSA and to restrain the withholding of payment of minimum wages and overtime compensation which are due employees under the Act.
>
> \*   \*   \*   \*   \*   \*
>
> Actions brought under Section 16(c) by the Secretary or under Section 16(b) by an employee have been consistently recognized as analogous to actions at law. A party in those actions has the right to a jury trial. *Lewis v. Times Publishing Co.,* 185 F.2d 457 (5th Cir.1950); 5 Moore's Federal Practice ¶ 38.27, p. 213–14. Section 11 of the Portal-to-Portal Act provides, however, that the issue of liquidated damages is triable to the court. *McClanahan v. Mathews,* 440 F.2d 320 (6th Cir.1971).

*Marshall v. Hanioti Hotel Corp.,* 490 F.Supp. 1020, 1022 & 1023 (N.D.Ga.1980) (footnote omitted).

**12.** Although the substantial line of authority in this Circuit has held that the question of employee determination is a legal one, it must be noted that there is contrary authority within the Circuit. In the recent case of *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190, 194 (5th Cir.1983), this Court stated:

> [1] An "employer" is defined under Section 3(d) of the Act as including "any person acting directly in the interest of an employer in relation to an employee." This term has been interpreted to encompass one or more joint employers, *Falk v. Brennan,* 414 U.S. 190, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973); *Hodgson v. Griffin and Brand of McAllen, Inc.,* 471 F.2d 235 (5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Wirtz v. Lone Star Steel Co.,* 405 F.2d 668 (5th Cir.1968). 29 C.F.R. § 791.2 (1982). Whether a party is an employer or joint employer for purposes of the FSLA [sic] is essentially a question of fact; accordingly, appellate review is subject to the clearly erroneous standard.

The two cases cited by this Court in *Sabine* stated that "[w]hether a person or corporation is an employer or joint employer is essentially a question of fact" and therefore subject to review under the "clearly erroneous" standard. *Griffin and Brand,* 471 F.2d at 237–38 (citing *Lone Star Steel*); *Lone Star Steel,* 405 F.2d at 669–70 [citing *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964)]. Two points need to be made. First, the *Sabine, Griffin and Brand,* and *Lone Star Steel* opinions all use the less-than-precise terminology "essentially a question of fact." At least in *Lone Star Steel,* this terminology was probably totally consistent with the line of cases in this Circuit holding that the ultimate determination of employee status is a question of law. The

Given the record testimony in the instant case, there are no unresolved issues of fact which would alter this Court's conclusion trial court's "findings of fact," held to be not clearly erroneous, were attached to the Court's opinion in *Lone Star Steel* as an appendix. All of these findings of fact were individual or underlying findings from which the Court could draw its legal conclusion as to employee status. In *Griffin and Brand,* where this Court reviewed the district court's conclusion that defendant was a joint employer under the clearly erroneous standard, the Court may have been misled by the imprecise "essentially a question of fact" language in *Lone Star Steel.* The determination is "essentially a question of fact" only if there are unresolved, underlying factual questions. The application of the rule of law regarding employee status to the underlying facts remains a conclusion of law.

Secondly, the *Lone Star Steel* opinion relied upon the Supreme Court's opinion in *Greyhound,* 84 S.Ct. at 899; the *Griffin and Brand* opinion also cited *Greyhound.* The Supreme Court in that case, however, did not state that the determination whether a person is an employer (and that plaintiffs therefore are employees) is essentially a question of fact. What the Supreme Court stated was that the question "whether *Greyhound* possessed sufficient *indicia of control* to be an 'employer' is essentially a factual issue." *Id.* (emphasis added). Findings regarding indications of control would, of course, be findings of fact. Most importantly, however, the Supreme Court's statement must be read in context. *Greyhound* involved the circumstances under which a district court can undertake a plenary review of orders of the National Labor Relations Board (Board) in certification proceedings. The Court in *Greyhound* was making a contrast between *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), upon which the district court in *Greyhound* had predicated its jurisdiction, and the factual situation in *Greyhound.* The district court in *Greyhound* had held that the Board's findings in the certification proceeding were insufficient as a matter of law to establish a joint employer relationship and that those findings established, as a matter of law, that Floors, Inc. was the sole employer of the employees in question; the court held that the Board had violated the National Labor Relations Act (NLRA) by attempting to conduct a representation election where no employment relationship existed. The Court of Appeals had affirmed. The Supreme Court reversed, stating that the case did not fall within the narrow and extraordinary limits of the *Kyne* exception which allows district court review of orders entered in certification proceedings. In *Kyne,* the Board conceded that it had acted in excess of its delegated powers, and the Board's order was contrary to a specific prohibition in the NLRA. The Court in *Greyhound* stated:

that plaintiffs were employees of defendant. The sole question is whether the facts satisfy the statutory standard for an "employee" under the FLSA. Since employee status was established as a matter of law, the district court erred in submitting it to the jury.

### 2. Employee Status

■ In order to resolve the question whether plaintiffs were employees of defendant, this Court will examine the relationship between Tonche and defendant. If Tonche was an employee of defendant, the plaintiff field workers were also defendant's employees. Even in the event that Tonche were an independent contractor, this Court could conclude that Tonche was a joint employer with the defendant; in this instance, the field workers would still be employees of the defendant. *Hodgson v. Griffin & Brand,* 471 F.2d 235, 237 (5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). In this hypothetical situation, the Court could, of course, conclude that Tonche was not a joint employer with the defendant. Since this Court concludes that Tonche was an employee of defendant, we do not examine the possibility of a joint employer status.

■ Defendant maintains that he hired Tonche as an independent contractor to chop his cotton[13] and that plaintiff field workers were therefore employees of Tonche. In determining an individual's status as "employee" within the meaning of the FLSA, however, defendant's intent or the label that he attaches to the relationship is meaningless unless it mirrors the "economic realities" of the relationship. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947); *Donovan v. Tehco,* 642 F.2d at 143; *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1315 (5th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976); *Mitchell v. Strickland Transportation Co.,* 228 F.2d 124, 126 (5th Cir.1955). Employee/independent contractor status under federal social welfare legislation is determined in light of the purposes of the legislation:[14]

And whether Greyhound possessed sufficient indicia of control to be an "employer" is essentially a factual issue, unlike the question in *Kyne,* which depended solely upon construction of the statute. The Kyne exception is a narrow one, not to be extended to permit plenary district court review of Board orders in certification proceedings whenever it can be said that an erroneous assessment of the particular facts before the Board has led it to a conclusion which does not comport with the law. Judicial review in such a situation has been limited by Congress to the courts of appeals, and then only under the conditions explicitly laid down in § 9(d) of the Act.

*Greyhound,* 84 S.Ct. at 899.

Furthermore, Greyhound had argued that the Board had acted in excess of its statutory powers when it found that Greyhound was an employer of employees who were hired, paid, transferred, and promoted by an independent contractor (Floors). In rejecting Greyhound's argument, the Supreme Court attempted to clarify that Greyhound's possible employer status was unaffected by any determination as to the status of Floors as an independent contractor, *i.e.,* a finding that Floors was an independent contractor did not preclude the existence of factual questions concerning Greyhound's status as an employer. The Court's point was that underlying factual issues regarding Greyhound's status as an employer could still remain despite a determination that Floors was an independent contractor—independent contractor status does not necessarily mean that the contractor is the sole person responsible for his employees under the Act. Placed in context, the "essentially a factual issue" statement in *Greyhound* does not undermine this Circuit's decision to review the ultimate conclusion as to employer status under the FLSA as a question of law.

13. Defendant argues that he contracted with Tonche to chop his cotton—not to furnish him with cotton choppers. This verbal distinction represents nothing more than an attempt at label attachment; the distinction is significant only insofar as it mirrors the economic reality of the relationship. *See Donovan v. Tehco,* 642 F.2d at 143. Not surprisingly, defendant admitted at trial that he expected Tonche to get the cotton chopped and that Tonche could not do the chopping all by himself, that he had to get others to chop.

14. The Supreme Court in *Rutherford,* 331 U.S. at 727, 67 S.Ct. at 1475 explained the purpose of the FLSA:

The Fair Labor Standards Act was passed by Congress to lessen, so far as seemed then

"[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service." *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947).[15] As this Court noted in *Fahs v. Tree-Gold Co-Op Growers,* 166 F.2d 40, 44 (5th Cir.1948):

> Under these decisions, the act is intended to protect those whose livelihood is dependent upon finding employment in the business of others. It is directed toward those who themselves are least able in good times to make provisions for their needs when old age and unemployment may cut off their earnings. The statutory coverage is not limited to those persons whose services are subject to the direction and control of their employer, but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.

Although defendant acknowledges that the common-law control test is not conclusive, defendant argues that the common-law control factors are material in defining an individual's status for purposes of the FLSA. Defendant places great weight on various specific control elements—defendant did not decide how many or which workers to hire and fire,[16] did not supervise the details of their work,[17] did not furnish the hoes, did not provide transportation, did not decide when the workers arrived at the fields and when they quit, and, defendant argues, did not determine their rate of pay.[18]

> practicable, the distribution in commerce of goods produced under subnormal labor conditions. An effort to eliminate low wages and long hours was the method chosen to free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers. It was sought to accomplish this purpose by the minimum pay and maximum hour provisions and the requirement that records of employees' services be kept by the employer.

**15.** The critical decisions interpreting the term "employee" in federal social welfare legislation are as follows: *NLRB v. Hearst,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) (for purposes of the National Labor Relations Act); *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) (for purposes of employment taxes on employers under the Social Security Act, as amended); and *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (for purposes of the Fair Labor Standards Act).

**16.** Defendant conceded at trial that he had the authority to fire a crew of workers.

**17.** Although defendant did not supervise the minor, regular tasks, the record demonstrates that he did exercise control over the significant aspects of the farming operations. Defendant showed Tonche where the fields were located; defendant determined which fields would be hoed and in what order; he gave instructions regarding which weeds to chop and which to leave in the ground; he determined when the workers had finished a job. Defendant went to the fields three to four times a week to check up on Tonche and the workers. He would make sure that they were in the right fields and he would often doublecheck Tonche's count of the number of workers in the fields on a particular day. Defendant admitted that it is the nature of the farming business that the farmer has to depend on his workers—the farmer cannot be in the fields supervising at all times.

**18.** Defendant argued at trial that Tonche set the workers' wages. Defendant testified that he asked Tonche how he wanted to "figure it" and Tonche replied he would figure $1.65 an hour (in 1977). Defendant also testified that he had no agreement with Tonche as to how much Tonche would pay the workers and that defendant had no idea how much Tonche did in fact pay them. Defendant also testified, however, as follows: "We [the farmers in the community] paid them the same amount all over the place for hoeing. All community-wide, it was the same. . . . I know what they [the farmers who were customers of defendant's bank] do. I know what they pay. They ask me what I am paying, and we are all the same." In addition, defendant testified that he gave money to Tonche for each day according to the number of hands he had listed as working on that day and the number of hours they worked. That is, defendant multiplied the number of workers times the number of hours worked times $1.65 an hour and on Fridays gave Tonche one check for the total number of hours worked. Moreover, defendant testified as follows:

> Q. You also hired friends of the wives of your full-time hands to hoe cotton, didn't you?
> A. Sometimes they would have a girl with them.
> Q. And you paid them $1.65 in 1977?
> A. I paid them the same.

By focusing on selected and isolated control factors, however, defendant loses sight of the circumstances of the whole activity. *See Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477. This Court has on several occasions found employment status even though the defendant-employer had no control over certain aspects of the relationship, *e.g.,* the right to set hours, hire and fire, or determine wages. *Usery,* 527 F.2d at 1312 (finding that "[i]n the total context of the relationship neither the right to hire employees nor the right to set hours" indicated such lack of control by [defendant] as would show that the laundry operators were independent contractors); *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 301 (5th Cir.1975) (stating that "the courts have had little difficulty in finding employment status though the employee could hire others within his own discretion"); *Fahs,* 166 F.2d at 43 (concluding that contractors at defendant's packing house were employees of defendant even though defendant had no right to control the number of employees, their wages or the hours they worked). As this Court stated in *Mednick,* 508 F.2d at

> Q. And you paid them $1.75 in 1978?
> A. Right.
> Q. In fact, you paid all your cotton hoers $1.65 in '77 and $1.75 in '78, isn't that true?
> A. That's true.
> Q. I believe, though, in your deposition you said that there was one person you felt sorry for a little bit and you had given her $2.00 an hour?
> A. Well, there may be.
> Q. Do you recall that?
> A. I won't doubt but what that is true. I think that's right. I think I have. I don't remember it offhand, who it was. But may have a special daughter-in-law or son-in-law or something that you give $2.00 to. I don't know. I don't know. I paid $2.00 maybe to somebody.

Assuming, *arguendo,* the existence of an issue of fact concerning who set the workers' wages, this Court would still come to the same legal conclusion even if the jury resolved the issue in favor of defendant.

**19.** *Rutherford,* 67 S.Ct. at 1477 and its companion case, *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947) (dealing with the meaning of employee for purposes of social security taxes), set out criteria for distinguishing employees from independent contractors. The *Rutherford* criteria are as follows:

300, the "ultimate criteria" for the determination of employee status are found in the purposes of the Act. The presence of some indications of independent contractor status, however, must not obscure the focal inquiry—is the individual whose status is in question the "kind of *person*" meant to be protected by the FLSA? *Id.* at 301.

The presence of certain elements of control is not necessarily determinative. Whether Tonche was exposed "to the evils the statute [FLSA] was designed to eradicate," *see id.* at 300, hinges upon whether he was dependent upon defendant's farming operation. Indeed, "[t]he touchstone of 'economic reality' in analyzing a possible employee/employer relationship for purposes of the FLSA is dependency." *Weisel,* 602 F.2d at 1189. The determinative question is whether the person is "dependent upon finding employment in the business of others." *Fahs,* 166 F.2d at 44. Two factors have emerged as critically significant in answering this question: (1) how specialized the nature of the work is, and (2) whether the individual is "in business for himself." [19]

(1) The workers did a specialty job on a production line.
(2) The contractual terms did not vary in any material way as one worker succeeded another.
(3) The premises and equipment were those of the proprietor.
(4) The workers had no "business organization" that could offer their services to others.
(5) The proprietor's manager kept close watch over the workers' activities.
(6) The workers could profit from "efficiency," but it was the efficiency of the pieceworker, not that of an "enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor."

*Mednick,* 508 F.2d at 300 (*citing Rutherford*). The *Silk* criteria are as follows: "(1) the permanency of the working relationship, (2) the opportunity for profit and loss, (3) investment in material, (4) the degree of control, and (5) the individual's skill." *Donovan v. Tehco,* 642 F.2d at 143 (*citing Silk*). Obviously, some of these 11 criteria overlap and some might not be relevant depending upon the particular case. This Court has stated that it is not possible to assign each of these factors a specific weight and that it is not necessary that evidence exist with respect to each factor in order to determine whether an employment relationship ex-

*Mitchell v. John R. Cowley & Brothers, Inc.,* 292 F.2d 105, 108 (5th Cir.1961). The first factor looks to whether the individual "regularly performs tasks essentially of a routine nature and that work is a phase of the normal operations of that particular business." If so, the Act ordinarily regards him as an employee. *Id.* The record unquestionably demonstrates the rote nature of Tonche's work. Cotton chopping involves one piece of equipment and one task: taking a hoe and chopping the weeds out of cotton. It is such a simple task that even children can do it—it requires no aptitude, no training, no skill, and no experience. Moreover, the evidence demonstrates that cotton chopping was merely a phase of the normal operation of defendant's cotton farming business. Cotton chopping constituted a part of an "integrated economic unit" devoted to the growing of cotton. *See Rutherford,* 67 S.Ct. at 1475 & 1476; *Shultz,* 432 F.2d at 264; *Fahs,* 166 F.2d at 44. Chopping the cotton made it grow and produce better, and made it easier to harvest. Chopping the cotton was an integral phase of defendant's entire farming operations. Although the chopping season only runs from mid-June to mid-August, the work is recurring and of relative permanence—it has to be done every year during the growing season in order to harvest a good cotton crop. In addition to chopping cotton,[20] Tonche supervised the workers in the field, provided transportation for some, kept what records there were of the number of workers and their hours, received a check from defendant every Friday, and meted out the earnings to the individual workers. All of these tasks were routine. The first inquiry, therefore, points strongly to employee status for Tonche and therefore for the field workers.

The second factor is the "focal inquiry in the characterization process": "whether the individual is or is not, as a matter of economic fact, in business for himself." *Donovan v. Tehco,* 642 F.2d at 143. The record here does not indicate that Tonche had anything that could be called an independent business as distinguished from personal labor.[21] Tonche was an illiterate with only two years of schooling. He could not read or write in either Spanish or English; he only knew how to write his name and numbers and how to figure. He kept his "records" of the number of field workers and the number of hours they worked on parts of paper sacks which he brought to defendant's bank. Some of these "records" were later transcribed into Tonche's record book by Tonche's son or daughter. The workers

---

ists. *Hickey v. Arkla Industries, Inc.,* 688 F.2d 1009, 1012 (5th Cir.1982). The cases tend to crystallize the criteria into the two basic inquiries listed above. Indeed, this Court in *Mednick,* 508 F.2d at 300, cautioned against placing too much emphasis on the *Rutherford* and *Silk* criteria, thereby losing sight of the ultimate criteria (the dependency question).

20. *See,* note 3, *supra.*

21. This Court in *Donovan v. Tehco,* 642 F.2d at 144, held that, given the exceptionally broad definition of employee in the FLSA, evidence introduced by the Secretary of Labor that the individuals in question were on the defendant-employer's payroll was sufficient to shift the burden of producing evidence to defendant. (The evidence consisted of wage transcriptions based on defendant's payroll records showing the number of hours each individual worked for defendant and his rate of pay.) This Court concluded that since defendant introduced little or no evidence to show that the individuals on its payroll were "in fact in business for themselves," the district court should have found that the Government had established the employee status of these individuals by the necessary preponderance of the evidence. In the instant case, plaintiffs introduced the checks that were given by defendant to Tonche in 1977 and 1978 as well as defendant's notebook in which defendant had recorded on a daily basis the information imparted to him by Tonche— the number of hands and the number of hours they worked. This evidence was sufficient to shift the burden of producing evidence that Tonche was in fact in business for himself to defendant. Defendant totally failed to carry this burden with regard to the issue before the Court—whether Tonche, as an independent businessman, was engaged in the business of offering crews of workers to defendant *and other growers.* (emphasis added). Assuming, *arguendo,* the relevance of the fact that Tonche junked cars in the winter, defendant likewise wholly failed to carry his burden of producing evidence that Tonche was not dependent on defendant's farming operation for his livelihood.

were often listed in Tonche's book by nicknames or by families. Tonche had "no experience or qualifications to distinguish him from the general run of workers." *See Mednick*, 508 F.2d at 303. Although Tonche did exercise some control over the field workers, there was no "economic substance" behind his power. *See id.* at 302. The fact that Tonche supervised minor, routine tasks cannot be "bootstrapped into an appearance of real independence." *See Usery*, 527 F.2d at 1312. Neither minor record keeping nor rote work, even if the work requires industriousness, is indicative of independence and nonemployee status. *Id.* at 1314. Any decisions involving judgment, initiative, or basic control were made by defendant, not Tonche. Tonche did not exert control over any meaningful part of defendant's business such that Tonche's "part" stood as a separate economic entity. *See id.* at 1312–13. Given the rate of pay and method of payment (by the hour) there was no real opportunity for Tonche to make any profit or loss. Except for the one simple and virtually indestructible instrument utilized—the hoe—all investment or risk capital was provided by defendant. Tonche's investment in hoes was "minimal in comparison with the total investment in land, heavy machinery and supplies necessary for growing" cotton. *See Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 755 (9th Cir.1979). Tonche's relationship with defendant was of limited duration but of a permanent nature, recurring every year.[22] Significantly, Tonche did not work or provide workers for any grower other than defendant. The record here does not supply any indicia whatsoever of a business operated by Tonche whereby he offered crews of workers to other growers. Indeed, Tonche did not recruit the workers as an independent businessman would. Instead, the workers, who were Hispanic, called Tonche from South Texas to inquire about work. Tonche did not operate with recog-

nizable or consistent crews in that the hands varied in number from day-to-day. In short, Tonche had little to transfer but his own labor. *See id.* at 1314.

Of particular importance is the fact that defendant did not pay Tonche enough for Tonche himself to pay the workers minimum wage; it was therefore impossible for Tonche to comply with the FLSA. *See Mitchell*, 292 F.2d at 109. Tonche, as an economic entity, was not capable of doing business elsewhere. *See Usery*, 527 F.2d at 1315. The economic reality of the situation was that the workers were dependent upon defendant—not Tonche—to pay them the minimum wage. They were dependent upon defendant's cotton growing business—not any "business" of Tonche's.[23] As this Court stated in *Mednick*, 508 F.2d at 303:

> An employer cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the F.L.S.A., by granting him some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have him operate.

This approximately fifty-four year old illiterate cotton chopper cannot be said to be an independent businessman in any meaningful sense.

One last point is in order. Defendant cannot rely on Tonche's registration as a "farm labor contractor" to establish independent contractor status for Tonche for purposes of the FLSA, thereby insulating himself from the FLSA requirements. As the Court in *Marshall v. Presidio Valley Farms, Inc.*, 512 F.Supp. 1195, 1197 (W.D. Tex.1981), stated: "This interpretation would permit wholesale evasion of the requirements of the F.L.S.A. Nothing in the Farm Labor Contractors Act suggests that this court must apply that Act to the exclusion of the F.L.S.A." The answer to the

---

**22.** The work done by the packing house contractors (determined to be employees) in *Fahs,* 166 F.2d at 45, was also seasonal.

**23.** Of course, these facts also support the conclusion that the field workers were employees

of defendant. Since this Court has concluded that Tonche was an employee of defendant, we do not separately discuss the relationship of the employees to defendant.

question of employee status lies in the "economic realities" of the situation. In the case at hand, those economic realities allow only one conclusion: Tonche was an employee of defendant.

B. *Willfulness*

■ Section 255(a) [24] of the Portal-to-Portal Act provides a three-year statute of limitations for willful violations of the FLSA.[25] The standard for willfulness was established by this Circuit in *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139, 1142 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). This Court in *Jiffy June* stated that the test is whether the employer knew the FLSA was in the picture. *Id.* This standard requires that employers have nothing more than "awareness of the possible applicability of the FLSA." *Id.* If an employer merely suspects that his actions might violate the Act, the violation is willful. The Court explained the necessity for this standard as follows:

The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employers to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent.

*Id.*

■ On appeal, defendant makes two arguments. First he contends that he had no reason to believe the FLSA was "in the picture" because he hired Tonche as an independent contractor and therefore assumed plaintiffs were employees of Tonche. This argument is without merit. It is little more than an attempt to exculpate himself by portraying Tonche in the guise of an independent contractor, by attaching a label to him. The *Jiffy June* standard mandates the rejection of defendant's argument: a violation committed in good faith can indeed be "willful." *Id.* at 1141.

Secondly, defendant argues that his violation was not willful because he had no knowledge that the FLSA was applicable. The *Jiffy June* standard does not require that defendant know that his actions are governed by the FLSA. It requires only that the employer have an "awareness of the possible applicability" of the Act. Indeed, this Court has unequivocally rejected the argument of "lack of knowledge" of the applicability of the FLSA: "An ostrichlike cultivation of ignorance has never been considered a defense to liability for willful violation of the Act." *Brennan v. Heard,* 491 F.2d 1, 3 (5th Cir.1974).

This Court turns to the record in the instant case to determine whether defendant had reason to suspect the FLSA was "in the picture." Defendant testified that he had been in the banking business for fifty-five years. Defendant had held the position of President of the First State Bank in Abernathy for twenty-six years and owned stock in the bank. As president of the bank, defendant worked in that business five days a week; he was aware of the minimum wage law and what the minimum wage was in 1976, 1977, and 1978. Defendant admitted that he had always paid his bank employees minimum wage, but protested that he did not know the minimum wage applied to his farm workers. Defendant used a particular law firm for legal

---

**24.** 29 U.S.C. § 255(a) provides as follows:

§ 255. *Statute of limitations*

Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, ... under the Fair Labor Standards Act of 1938, as amended, . . .

(a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, ex-

cept that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

**25.** Plaintiffs in this case do not request recovery of unpaid wages for three years back. The significance of the willfulness issue relates to (1) whether plaintiffs' 1977 wage claims are barred (a two-year statute would bar any claims that accrued prior to February 14, 1978), and (2) whether plaintiff Reynaldo Arriolas' (added as a plaintiff in February 1981 by an amended complaint) 1978 wage claim is barred.

advice, but testified that he had never even made inquiry of his attorneys whether his farm employees were covered by the minimum wage law.

Given this record testimony, defendant may not assume "an ostrichlike cultivation of ignorance" and urge it as a defense. Good faith ignorance will not shield a defendant from his obligation to make "further inquiries" and to "determine the exact parameters of his statutory obligation." *See id.* In *Jiffy June,* the defendant had even sought and secured legal advice that his employees were exempt from the FLSA. *Jiffy June,* 458 F.2d at 1141–42. Even so, his violation was held to be willful. Here, the fact that defendant knew of the existence of the minimum wage law and paid minimum wage to his bank employees compels a finding of willfulness under the *Jiffy June* standard.

### C. *Number of Hours Worked*

■ Defendant failed to keep records of the hours worked by the individual plaintiffs [26] as required by 29 U.S.C. § 211(c).[27] This section places on the employer the obligation of keeping accurate records of the hours worked by his employees; the employer cannot transfer his statutory duty to his employees. *Goldberg v. Cockrell,* 303 F.2d 811, 812 n. 1 (5th Cir.1962).

Defendant argues on appeal that his failure to keep records was mitigated by the fact that Tonche kept records which were introduced into evidence. Tonche's records were clearly incomplete and insufficient to satisfy the record keeping provisions of the Act. Moreover, this Court in *Goldberg, id.,* stated that "while there is nothing to prevent an employer from delegating to his employees the duty of keeping a record of

their hours, the employer does so at his peril. He cannot escape the record keeping provisions of the Act by delegating that duty to his employees." (*citing Mitchell v. Reynolds,* 125 F.Supp. 337, 340 (W.D.Ark. 1954)). Furthermore, an employer must decide at his peril which employees are covered by the Act. *George Lawley & Son Corp. v. South,* 140 F.2d 439 (1st Cir.), *cert. denied,* 322 U.S. 746, 64 S.Ct. 1156, 88 L.Ed. 1578 (1944).

In *Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946), the Supreme Court specified the burden of proof in cases where the employer has failed to maintain the records required by the FLSA:

> In such a situation, we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

A number of Fifth Circuit cases have applied this standard. *See, e.g., Skipper v. Superior Dairies, Inc.,* 512 F.2d 409, 419–20 (5th Cir.1975); *Brennan v. General Motors Acceptance Corp.,* 482 F.2d 825, 829 (5th Cir.1973); *Shultz,* 432 F.2d at 261.

In formulating this standard, the Court was concerned that employees not be penalized by an employer's failure to comply

---

**26.** The only records kept by defendant were his weekly paychecks to Tonche and a notebook which contained a tally of the hours worked each week (listing the number of hands and the number of hours worked) in 1978.

**27.** 29 U.S.C. § 211(c) provides as follows:

(c) Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed

by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

with its statutory duty to maintain accurate records:

> When the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.

*Anderson,* 66 S.Ct. at 1192.

■ In the instant case, plaintiffs met their burden of proof by demonstrating that they performed work and were not compensated in accordance with the statute. Thirteen plaintiffs testified regarding the hours they and members of their families worked. Plaintiffs' witness Walter Johnston, a Ph.D. candidate in statistics, calculated a minimum and maximum number of hours each plaintiff worked, basing his calculations on plaintiffs' testimony. Defendant calculated his payments to Tonche based on the rate of $1.65 per man hour in 1977 and $1.75 per man hour in 1978. The court took judicial notice of the minimum wage in these two years: $2.20 an hour in 1977 and $2.65 an hour in 1978. At that point, the burden of proof shifted to defendant to prove the precise amount of work plaintiffs performed or to negative[28]

the reasonableness of the inferences to be drawn from plaintiffs' evidence.[29]

The court, however, failed to properly place the burden of proof. The court's only instruction to the jury in this regard was that "it is the duty of an employer to keep and maintain accurate records of the number of hours that an employee works for said employer and it is not the duty of the employee to keep such records."

Plaintiffs did not object to the court's instruction. The burden of proof, however, is "always of major importance," *Sheppard Federal Credit Union v. Palmer,* 408 F.2d 1369, 1372 (5th Cir.1969) and this Court is persuaded that proper placement of the burden of proof in this case could have made a substantial difference in the determination of the number of hours worked by each plaintiff. This Court therefore concludes that the district court's charge constituted plain error and reviews the instruction on appeal despite plaintiffs' failure to object at the trial level. Because the court failed to properly place the burden of proof, this Court reverses and remands for a new trial on the number of hours worked by plaintiffs.

### C. *Conclusion*

This Court has concluded that Tonche was an employee of defendant and that therefore plaintiffs were defendant's employees, that defendant's failure to pay minimum wage was willful, and that the district court's erroneous instruction which failed to specify the burden of proof necessitates a new trial on the number of hours worked by the individual plaintiffs.

### II. *The FLCRA Claim*

The issues this Court must address concerning the FLCRA claim involve the ques-

---

**28.** Webster's defines "negative" as follows: "to demonstrate the falsity of: disprove" or "contradict." Webster's Third New International Dictionary (1976).

**29.** In the instant case, defendant's efforts to impeach plaintiffs' testimony were minimal. Defendant attempted to show that the names of certain plaintiffs did not appear in Tonche's records and that Tonche's record books accounted for fewer hours than were paid for

by defendant in his checks to Tonche. Plaintiffs' own testimony, however, had already established that Tonche's records were incomplete. Otherwise, testimony by defendant's fulltime hands (who planted, ploughed, and harvested) merely made general allegations that the field workers were lazy and misrepresented the number of hours they worked. This testimony did not identify any particular worker or workers.

tions whether Tonche was a farm labor contractor and whether defendant's violation of the Act was intentional.

## A. The Fee Issue

■ The FLCRA requires that a farmer who uses a contractor (1) verify that the contractor is registered before hiring him [30] and (2) maintain wage and hour records of the individual members of the contractor's crew.[31] Defendant made certain that Tonche was registered as a farm labor contractor but made no effort to maintain the statutorily-required payroll records on plaintiffs. The jury's response to Special Issue 8 that defendant did not fail to obtain and maintain payroll records finds no support in the evidence.

The question on appeal is whether defendant used a farm labor contractor within the statutory definition of the term. The FLCRA defines a farm labor contractor as follows: "any person, who for a fee, either for himself or on behalf of another person, recruits, solicits, hires, furnishes, or transports ten or more migrant workers (excluding members of his immediate family) at any one time in any calendar year for interstate agricultural employment." 7 U.S.C. § 2042(b). During the period when defendant dealt with Tonche, Tonche was registered with the DOL as a farm labor contractor pursuant to 7 U.S.C. § 2043(a). Defendant conceded that each year Tonche worked for him, he asked Tonche to show him Tonche's registration card [32] before Tonche first started working and before paying him.[33]

The only question in ascertaining Tonche's status is whether Tonche worked

---

**30.** 7 U.S.C. § 2043(c) provides as follows:

(c) No person shall engage the services of any farm labor contractor to supply farm laborers unless he first determines that the farm labor contractor possesses a certificate from the Secretary that is in full force and effect at the time he contracts with the farm labor contractor.

**31.** 7 U.S.C. § 2050c provides as follows:

§ 2050c. Recordkeeping

Any person who is furnished any migrant worker by a farm labor contractor shall maintain all payroll records required to be kept by such person under Federal law, and with respect to migrant workers paid by a farm labor contractor such person shall also obtain from the contractor and maintain records containing the information required to be provided to him by the contractor under section 2045(e) of this title.

Section 2045(e) provides that "[e]very farm labor contractor shall—

(e) in the event he pays migrant workers engaged in interstate agricultural employment, either on his own behalf or on behalf of another person, keep payroll records which shall show for each worker total earnings in each payroll period, all withholdings from wages, and net earnings. In addition, for workers employed on a time basis, the number of units of time employed and the rate per unit of time shall be recorded on the payroll records, and for workers employed on a piece rate basis, the number of units of work performed and the rate per unit shall be recorded on such records. In addition he shall provide to each migrant worker engaged in interstate agricultural employment

with whom he deals in a capacity as a farm labor contractor a statement of all sums paid to him (including sums received on behalf of such migrant worker) on account of the labor of such migrant worker. He shall also provide each such worker with an itemized statement showing all sums withheld by him from the amount he received on account of the labor of such worker, and the purpose for which withheld. The Secretary may prescribe an appropriate form for recording such information.

**32.** The fact that Tonche carried a farm labor contractor identification card does not confer independent contractor status upon him for purposes of the FLSA.

**33.** Defendant testified as follows:

Q. When he showed you—he showed you his card, didn't he?

A. I asked him if he had a card to pay him with, and he said yes, and he showed me this card.

Q. Okay. And that happened in both 1977 and 1978?

A. Yes, happened every year that he worked for me.

    \*    \*    \*    \*    \*    \*

Q. And you wrote down the '78 registration number inside the cover of the book, isn't that correct?

A. Inside this?

Q. Yes. . . . Okay. And you did that when Mr. Tonche first started working for you in '78?

A. Well, that's when he started working, I asked him if he had his card, and he said,

"for a fee" as required by section 2042(b).[34] The term "fee" as used in the Act "includes any money or other valuable consideration paid or promised to be paid to a person for services as a farm labor contractor." 7 U.S.C. § 2042(c). It is undisputed that Tonche received consideration for his services. The record evidence demonstrates that Tonche received $1.65 an hour for his services in 1977 and $1.75 an hour in 1978—the same amount that defendant paid almost all of his hands. FLCRA regulations make clear that salary or wages suffice as a "fee" when paid to a person for services as a farm labor contractor. 29 C.F.R. § 41.5 (1982). This Court has no difficulty in viewing the consideration received by Tonche as a "fee" for the management and supervision of the workers. The record reveals no evidence of an agreement that

Tonche's hourly wage was solely for chopping cotton;[35] moreover, even if Tonche's hourly wage were viewed as compensation for chopping, it would still constitute a "fee" within the meaning of the Act. Tonche's "chopping job" existed by virtue of his furnishing a crew for defendant, *i.e.,* Tonche furnished defendant with a crew because of defendant's offer of a steady chopping job for Tonche and his family. Tonche's wages constituted a "fee" for his services; Tonche was a farm labor contractor within the meaning of the statute.

### B. *Intentional Violation*

7 U.S.C. § 2050a(b) provides for either actual damages or liquidated damages[36] of up to $500[37] for each intentional violation of the Act.[38] The term "intentional" within this section means "conscious or deliberate" and does not require a specific

---

"Yes," and that's what we put down, was '78, because it was '78.

Q. Okay. You wrote the registration number down?

A. Yes, I put this down here.

**34.** When the district court denied plaintiffs' motion for a judgment n.o.v., the court stated that "[r]easonable minds could have differed as to whether Tonche's compensation constituted a fee for recruiting and furnishing migrant workers or a payment for services he performed as an hourly paid laborer. The district court, however, erred in submitting the question of Tonche's status as a farm labor contractor to the jury. There was no unresolved issue of fact—it was undisputed that Tonche received consideration for his services. Whether this consideration constituted "a fee" within the statutory definition is a question of law. *See Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1220–21 (7th Cir.1981) (treating the fee issue as a question of law); *Marshall v. Coastal Growers Ass'n,* 598 F.2d 521, 523–24 (9th Cir.1979) (treating the fee issue as a question of law); *Soliz v. Plunkett,* 615 F.2d 272, 275 (5th Cir. 1980) (holding that the issue of whether the putative farm labor contractor "furnished" migrant workers to the farmers was a question of law).

**35.** Indeed, defendant's argument that Tonche was paid an hourly wage for his labor chopping cotton, not for furnishing defendant with migrant workers to hoe the cotton, is reminiscent of his argument on the "employee" issue under the FLSA claim. *See supra,* note 13. Surely Congress could not have intended application of the FLCRA to depend on how the farmer characterizes his agreement with the farm la-

bor contractor. Such an interpretation would be inconsistent with the remedial nature of the Act. *See Soliz,* 615 F.2d at 275 (5th Cir.1980) (stating that the "Act should be broadly construed because it is remedial in nature"). Allowing compliance with the Act to rest on the farmer's characterization of his agreement with the farm labor contractor (he hired the farm labor contractor to perform a task, not to furnish the workers necessary for the performance of the task) would permit wholesale evasion of the Act.

**36.** Plaintiffs in the instant case have requested liquidated damages.

**37.** There is some dispute among district courts as to whether a court must award each plaintiff $500 per violation or may in its discretion award up to $500 per violation. *See Espinoza v. Stokely-Van Camp, Inc.,* 641 F.2d 535, 539 (7th Cir.), *overruled, Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1221 (7th Cir.), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). The sounder position espoused by the Seventh Circuit in *Joan of Arc,* 658 F.2d at 1224 is that § 2050a(b) permits a district court to award liquidated damages of up to $500 for each violation of the Act.

**38.** 7 U.S.C. § 2050a(b) provides in pertinent part as follows:

If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation prescribed hereunder, it may award damages up to and including an amount equal to the amount of actual damages, or $500 for each violation, or other equitable relief.

intent to violate the Act. *Joan of Arc,* 658 F.2d at 1224.[39] The standard for an intentional violation has also been referred to as "the common civil standard which holds a person liable for the natural consequences of his or her acts." *DeLeon v. Ramirez,* 465 F.Supp. 698, 705 (S.D.N.Y.1979) (stating that the courts have adopted this interpretation because of the remedial purposes of the Act).

Applying this standard of intentionality to the instant case, this Court concludes that defendant's admission at trial establishes that his violation of section 2050c (failure to maintain payroll records on plaintiffs) was intentional within the meaning of section 2050a(b). In response to questions by plaintiffs' attorney, defendant admitted that in both 1977 and 1978 when Tonche started working for him, he asked Tonche if Tonche had a card "to pay him with" and that Tonche showed defendant his farm labor contractor identification card.[40] Defendant's testimony establishes that he was aware of the existence of a law requiring farm labor contractors to carry identification cards in order to be paid. Under the intentionality standard of section 2050a(b) defendant is held liable for the natural consequences of his acts. Defendant's own testimony reveals that his failure to keep payroll records on the individual plaintiffs was intentional within the meaning of the Act.[41]

## C. *Conclusion*

This Court has concluded that the record establishes as a matter of law that defend-

**39.** The Seventh Circuit in *Joan of Arc* upheld the district court's finding that defendant's "harmless technical" violation of the Act fell within the meaning of the term "intentional." The defendant in that case was a farm labor contractor who did not have a specific intent to violate the FLCRA. His violation consisted of inadvertently not applying for registration with the DOL until April 1978 although the DOL and the Texas Employment Commission had earlier approved defendant's recruitment of migrant workers which began in late 1977.

**40.** *See* defendant's quoted testimony, *supra,* note 33.

**41.** Concluding that defendant's violation was intentional is especially appropriate in view of the fact that Tonche's farm labor contractor activities were performed exclusively for defendant. Allowing the farm operator to "go untouched" in such circumstances "could lead to the full scale evisceration of the Act." *See DeLeon,* 465 F.Supp. at 705 (involving a failure to require that the farm labor contractor be validly registered).

Such a conclusion is also appropriate given that the recordkeeping obligation imposed (by the 1974 amendments to the Act) on farmers who use contractors was part of an attempt by the legislature to provide a more effective enforcement mechanism for violations of the Act. *See* S.Rep. No. 1295, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6441, 6443 & 6445–46.

Furthermore, the standard this Court has adopted for an intentional violation is particularly appropriate in light of the interrelationship between the FLCRA and the FLSA—the former can be used to enforce rights conferred by the latter:

In addition to helping the farmworker remedy FLCRA violations, the FLCRA requirements aid the farm worker under other federal statutes. For example, FLCRA interrelates with the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (1976), to provide important protections and remedies for farmworkers. Although FLSA requires all agricultural employers to maintain payroll records showing the hours worked and the wages paid, *id* § 211(c); Records To Be Kept By Employers, 29 C.F.R. § 16.33 (1980), it contains no private enforcement mechanism if the employer fails to maintain such records. Since workers rarely keep similar records on their own, farmworker minimum wage actions under FLSA § 206 usually dissolve into swearing matches in which farmworkers are at a great disadvantage. FLCRA, however, requires contractors and users of contractors to maintain the payroll records prescribed by FLCRA *itself and payroll records required by any other federal statute* 7 U.S.C. § 2050c (1976). Thus the FLCRA $500 penalty per violation can be used to address the failure to maintain FLSA records. *See, e.g., Cantu v. Owatonna Canning Co.,* 90 Lab.Cas. ¶ 33,968 (D.Minn.1980). An employer forced to maintain proper payroll records *is not likely to maintain records showing him to be guilty of minimum wage violations.* Thus, he is deterred from committing FLSA violations. In this manner FLCRA functions to enforce rights created by, but unenforceable under, FLSA.

Note, A Defense of the Farm Labor Contractor Registration Act, 59 Tex.L.Rev. 531, 537 n. 61 (1981).

ant used a farm labor contractor, that defendant violated the FLCRA by not maintaining payroll records on plaintiffs, and that defendant's violations were intentional within the meaning of the Act. On remand, the district court must determine the number of violations defendant has committed,[42] and may, in its discretion, award each plaintiff liquidated damages of up to $500 per violation.[43]

This Court reverses and remands for proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

HIGGINBOTHAM, Circuit Judge, specially concurring:

I concur, but add this note, not for qualification but for caveat. Our efforts to justify appellate review by attempting to separate intertwined subsidiary facts and ultimate legal conclusions inevitably cast surrealistic shadows. The exercise can, and occasionally does, do little more than serve as a covering cape for the exercise of the trial court function by an appellate court. That transfer can frustrate assignments of institutional responsibility and deny efficacy to the Seventh Amendment.

I do not here need the comfort of the exercise. Genuinely undisputed facts at trial permit no conclusion but that Manuel Tonche was Ercell Givens' employee, or that Givens' conduct was wilful under *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir.1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972).

---

**42.** Section 2050c requires defendant to maintain both FLCRA payroll records and FLSA records. On remand, the district court must decide whether defendant's failure to maintain these records constitutes one or more violations.

**43.** In deciding on the amount of liquidated damages to award per violation, the district court should keep in mind that, although plaintiffs did not prove out-of-pocket losses on their FLCRA claim, they were clearly prejudiced by defendant's failure to maintain records in their ability to establish their FLSA wage claims.