Matias AVILES, et al., Plaintiffs,

v.

Donald KUNKLE, et al., Defendants.

Civ. A. No. L–85–45.

United States District Court,
S.D. Texas,
Laredo Division.

June 10, 1991.

Israel M. Reyna, Attorney in Charge, Texas Rural Legal Aid, Inc., Guadalupe Canales, Co–Counsel, Laredo, Tex., for plaintiffs.

Don Kunkle, pro se.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

KAZEN, District Judge.

The following findings of fact and conclusions of law, rendered pursuant to Fed. Rule Civ.Proc. 52(a), supplement *Partial Findings and Conclusions* as to jurisdiction made on March 14, 1991. This case was tried to the Court on November 7, 1990. It involves claims brought by Texas migrant workers under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA")[1], 29 U.S.C. §§ 1801 *et seq.* and The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* The Plaintiffs' claims arise from their employment at the Ohio farm of Defendants Donald and Richard Kunkle during the 1983 pickle and tomato harvest.[2]

### *The Family Business Exemption of the AWPA*

■ At trial, Defendant Donald Kunkle contended that Kunkle Farms was not subject to the provisions of the AWPA since it fell within the family business exemption contained in 29 U.S.C. § 1803(a)(1). This

**1.** The AWPA repealed and replaced the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041, *et seq.* The Plaintiffs stipulated to a voluntary dismissal of all AWPA claims against Carlos Felix for his alleged violations of the farm labor contractor provisions of the Act,

section exempts "(a)ny individual who engages in a farm labor contracting activity on behalf of a farm ... which is owned or operated exclusively by such individual or an immediate family member of such individual family member ... if such activities are performed ... exclusively by such individual or an immediate family member." *Id.* "Farm labor contracting activity" includes "recruiting, soliciting, hiring, employing, furnishing or transporting any migrant or seasonal agricultural worker". *Id.* § 1802(6). The Defendant carries the burden of proof to establish this exemption. *See Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1137 (5th Cir.1988).

■ The Act states that the family business exemption applies only when a farm is owned by immediate family members and the immediate family members are the only persons to recruit, solicit, hire, employ, and furnish or transport migrant workers. 29 U.S.C. § 1803(a)(1); *see also Martinez v. Berlekamp Farms, Inc.*, 635 F.Supp. 1191, 1193–94 (N.D.Ohio 1986). The use of a third party to perform farm labor contracting activities disqualifies the owner for the family business exemption under the Act. *Id.* at 1194; *Bueno v. Mattner*, 829 F.2d 1380, 1384 (6th Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988).

■ In this case, Defendant Felix performed farm labor contracting activities when he recruited and hired the Plaintiffs on behalf of Kunkle Farms. At trial, Donald Kunkle did not claim, or present evidence to establish, that Felix was an immediate member of the Kunkle family. Accordingly, the Defendants cannot claim the benefit of the family business exemption since they accepted the benefit of migrant labor brought to the farm through the efforts of a non-family member, Carlos Felix.

with the exception of the retaliation claims brought under 29 U.S.C. § 1855(a).

**2.** The Plaintiffs' request to amend their complaint to properly name the individuals who brought this complaint is GRANTED.

*See Bueno,* 829 F.2d at 1384.[3]

### Employment Status of the Plaintiffs Under the AWPA and the FLSA

The parties stipulated that the Plaintiffs were "employees" within the meaning of the AWPA. Joint–Pre Trial Order, Admissions of Facts, docket entry 30, page 14. At trial, however, Defendant Kunkle contended that the Plaintiffs who harvested pickles were not employees of Kunkle Farms since they had a sharecropper arrangement covering that crop. The Court has waived the stipulation to determine the employment status of those Plaintiffs who worked in the pickle fields.[4]

Courts do not apply the traditional common-law analysis to distinguish between "employees", to whom the AWPA and FLSA apply,[5] and "independent contractors", to whom they do not. Rather, the analysis focuses on the economic reality of the employment relationship. Merely labeling the worker as an employee or independent contractor is not dispositive. *Donovan v. Tehco, Inc.,* 642 F.2d 141, 143 (5th Cir.1981).

The Court is guided by various factors when determining whether an individual is an employee: (1) the degree of control which an employer has over the manner in which work is performed; (2) the extent of the investments of the employer and the worker; (3) the degree to which the worker's opportunity for profit and loss is determined by the employer; (4) the skill and initiative required to perform the job; and (5) the permanence of the working relationship. *Brock,* 814 F.2d at 1043. These factors are not exhaustive but merely aid in assessing the "economic dependence" of the putative employees, the touchstone for the test. *Id.* at 1043–44.

The Fifth Circuit, on another occasion, identified two factors as "critically significant" to this decision: (1) how specialized the nature of the work is, and (2) whether the worker is sufficiently independent to be "in business for himself." *Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1327–28 (5th Cir.1985); *see also Castillo v. Givens,* 704 F.2d 181, 190 (5th Cir.1983). The Court will proceed to analyze the various factors.

(1) *Control.* Kunkle Farms exercised control over the Plaintiffs while they were at work. Donald Kunkle and Carlos Felix assigned the tracts of land to be harvested and appeared in the fields daily to supervise the harvesters.[6] Defendant Kunkle chose the size and color of the pickles to be harvested, and he calculated the harvesters' income based upon the price which he negotiated with the packing shed. All aspects of the employment relationship—the price, crop cultivation, wages, work assign-

---

3. Defendants Kunkle contend in their Proposed Findings of Fact and Conclusions of Law that they are exempt from AWPA requirements pursuant to the small business exemption contained in 29 U.S.C. § 1803(a)(2). This section exempts an employer who did not, during any calendar quarter during the preceding calendar year, use more than 500 "man-days" of agricultural labor. *Id., see also* 29 U.S.C. § 213(a)(6)(A) (identical FLSA exemption applicable to AWPA). This contention is rejected since the record does not contain evidence to establish the "man days" worked in "any calendar quarter" during "the preceding calendar year," *i.e.,* 1982.

4. It is not disputed that the tomato harvesters were employees of Kunkle Farms during the 1983 harvest.

5. In enacting the AWPA, Congress expressly adopted the holdings in three employment relationship cases arising under the FLSA. Thus, once a worker has been classified as an employ-ee, he is afforded the protections of both statutes. *Real v. Driscoll Associates Inc.,* 603 F.2d 748 (9th Cir.1979), the case adopted by Congress in the employee/independent contractor area, sets forth the same criteria for determining the employment relationship as those utilized by the Fifth Circuit in *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir.1987), *cert. denied,* 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987). *See* H.R.Rep. No. 885, 1982 U.S.Code Cong. & Admin.News 4547, 4553.

6. In their Proposed Findings and Conclusions, Defendants Kunkle state that the workers were responsible to inform the "farmer as to the presence of insects for needed spraying" and "as to the condition of the ground for needed irrigation." There is no such evidence in the record. Even if there were such evidence, it would not establish that the workers were given control over the spraying and irrigation duties, only that they were told to report certain occurrences to the Defendants.

ments and the right to deal with the pickle buyers—were controlled by the Defendants. *See Castillo*, 704 F.2d at 190.

(2) *Capital investment.* Kunkle Farms had the sole real investment in the farming operations. There is no evidence that the Plaintiffs invested even a small amount of funds into the Defendants' business, or furnished even light equipment such as gloves, hoes, or buckets to facilitate their work in the fields. Moreover, such expenditures would be minimal compared with Kunkle Farms' investment in the land, machinery and supplies necessary for carrying on a farming operation. *Real*, 603 F.2d at 755; *see also McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 876 (5th Cir.1989), *modifying*, 861 F.2d 450 (5th Cir.1988) (workers who provided only knives and garments did not invest in seafood work facility).

(3) *Opportunity for profit and loss.* The Plaintiffs did not have any significant independent opportunity for profit and loss to indicate they were independent contractors. The migrant workers' earnings were ultimately dependent upon the contract price for the pickles negotiated by Kunkle Farms. The only source from which the workers obtained a return was on their own labor. Such returns are "more properly classified as wages, not profits." *Brock*, 814 F.2d at 1050–51 (defining profit as "the gain realized from a business over and above its capital expenditures"). In this case, the Plaintiffs were "wage earners toiling for a living, [not] independent entrepreneurs seeking a return on their risky capital investments." *Id.*

(4) *Degree of skill required.* The level of skill required to harvest pickles at Kunkle Farms did not set the Plaintiffs apart from the harvesters of other crops. There is no evidence to suggest other than that the work involved "one piece of equipment, a bucket, and one task, picking the size vegetable the worker has been told to pick and putting it in the bucket." *Beliz*, 765 F.2d at 1328. Defendants Kunkle did not require that a pickle harvester have prior experience or provide any type of training

before hiring the workers. The evidence did not establish that a migrant gained any technical knowledge or specialized skill from his endeavors as a pickle harvester. The Plaintiffs were not "specialists", but rather were "unskilled laborers who performed the essential everyday chores" for Kunkle Farms' pickle-harvesting operation. *Seafood, Inc.*, 867 F.2d at 876–77.

(5) *Permanency.* When an industry is seasonal, such as harvesting, the focus for determining permanency is whether the individuals worked for "the entire operative period of a particular season." *See Brock*, 814 F.2d at 1054. In this case, the Plaintiffs were hired to work exclusively for Kunkle Farms for the duration of the 1983 pickle and tomato harvests. Although many left the farm before season's end due to a dispute with the Defendants, the relationship was originally intended to be permanent for the 1983 harvesting season. *Id.*

The various guiding factors clearly indicate that the Plaintiffs were not "in business for [themselves]." *Beliz*, 765 F.2d at 1327; *Castillo*, 704 F.2d at 190. The Plaintiffs depended on the Defendants' land, crops, agricultural expertise, equipment and marketing skills. The workers had "no independent business organization that they could market and transfer from employer to employer." *Brock*, 814 F.2d at 1055. Kunkle Farms controlled the salient aspects of the farming operation, the migrant workers, and the terms of the workers' compensation. The Plaintiffs could not independently affect profit and loss. Kunkle Farms supplied all the risk capital and little extra skill is required to be a pickle harvester. The Plaintiffs intended to be permanent workers for the duration of the 1983 harvest. In economic reality, the pickle harvesters were "dependent upon finding employment in the business of others". *Seafood, Inc.*, 867 F.2d at 877 (citing *Beliz*, 765 F.2d at 1327–28). The pickle harvesters were, therefore, employees of Kunkle Farms within the meaning of the AWPA and the FLSA.[7]

---

7. Under similar circumstances, other circuits have applied the *Beliz* factors and reached different results when classifying migrant workers harvesting pickles. *Compare Secretary of Labor*

## The AWPA Intentional Violation Standard

■ 29 U.S.C. § 1854(c)(1) provides for either actual or liquidated damages of up to $500.00 for each intentional violation of the Act. Although the intentional violation standard under the AWPA has not been addressed by the Fifth Circuit, the legislative history of the Act indicates that the standard is identical to that in the analogous provision of the Farm Labor Contractor Registration Act (FLCRA), 7 U.S.C. § 2050a(b), repealed and replaced by Section 1854(c)(1) of the AWPA. 1982 U.S. Code Cong. & Admin.News 4567; *see also Bueno*, 829 F.2d at 1385 n. 4.

In FLCRA cases, the term "intentional" means "conscious or deliberate" and does not require a specific intent to violate the law. It refers to the standard by which a person may be held "liable for the natural consequences of his or her acts." *Castillo*, 704 F.2d at 197–98. In *Salazar–Calderon v. Presidio Valley Farmers Assoc.*, the defendants argued that they should not be held liable for FLCRA violations since they had no knowledge of the statute. 765 F.2d 1334, 1345 n. 5 (5th Cir.1985). In dicta, the Court stated that this argument was meritless, emphasizing that the inquiry should focus on the deliberateness of the conduct involved and "not the defendant's knowledge of the Act." It reasoned that the intentional standard must be construed "so as to further the Act's *remedial* purposes." *Id.; see also Bueno*, 829 F.2d at 1386 (discussing Fifth Circuit cases and holding that defendant was liable for intentional AWPA violations without knowledge of statute).

The AWPA was adopted in January of 1983 and became effective on April 14th of that same year. Final regulations were not published until August, although interim regulations were published in April. *Bueno*, 829 F.2d at 1385. This was only two months before the Plaintiffs arrived at Kunkle Farms for the 1983 harvest. Defendant Donald Kunkle testified that he did not learn of the Act until government personnel briefed him on its requirements sometime during the summer of 1983. He admits, therefore, that Kunkle Farms failed to comply with several of the AWPA recruitment and disclosure provisions upon the migrants' arrival at the camp and throughout most of the harvest. The Defendants' lack of knowledge, however, does not preclude a finding that the Kunkles committed an intentional violation of the Act.

## AWPA Violations

■ *29 U.S.C. § 1821(a), (b), (c), (d): Information and recordkeeping requirements.* The AWPA attempts to safeguard migrant workers' rights by requiring employers to provide workers at the time of recruitment with written terms and conditions of employment. 29 U.S.C. § 1821(a)(1)–(7).[8] It also requires the employer to post "in a conspicuous place a poster provided by the Secretary setting forth the rights and protections afforded [migrant] workers" under the Act. *Id.* § 1821(b). Additionally, those employers who provide housing must give written notice of any occupancy terms or conditions. *Id.* § 1821(c). An employer must also

---

*v. Lauritzen*, 835 F.2d 1529, 1538 (7th Cir.1987), *cert denied*, 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988) (pickle harvesters were employees) *with Donovan v. Brandel*, 736 F.2d 1114, 1120 (6th Cir.1984) (pickle harvesters were independent contractors). At trial, Donald Kunkle testified that he relied upon the *Brandel* decision, a case from his Circuit, to classify the Plaintiffs as "sharecroppers" or independent contractors. This case has been narrowed and distinguished, however, even in its own circuit. *Donovan v. Gillmor*, 535 F.Supp. 154, 163 (N.D. Ohio 1982), *appeal dismissed*, 708 F.2d 723 (6th Cir.1982), was a pre-*Brandel* decision wherein a District Court in the Sixth Circuit held that

pickle harvesters were employees. The same District Court reexamined this decision after *Brandel* and reaffirmed its original, inconsistent holding in an unpublished order. *Lauritzen*, 835 F.2d at 1536.

**8.** The Court has concluded that the Defendants recruited the Plaintiffs. Partial Findings and Conclusions, page 6. This process began in Ohio in 1982 and continued until the workers departed for Kunkle Farms in June of 1983. *Id.* Since the recruiting process was ongoing during April of 1983, the enactment date of the AWPA, the Defendants are responsible for recruiting disclosure violations under the Act.

make and preserve certain wage-and-hour records and must distribute this information to the employees with each paycheck. *Id.* § 1821(d)(1), (2).

Defendant Donald Kunkle testified that he did not provide written recruiting disclosures regarding the terms and conditions of employment or notify the Plaintiffs of the terms of occupancy. He also testified that there was no conspicuous posting, at least in the first part of the season. The wage-and-hour records for the tomato and pickle harvests lacked the information which must be compiled and provided to each employee. These omissions are in direct violation of 29 U.S.C. § 1821(a), (b), (c) and (d)(1), (2).[9] Defendants Kunkle are, therefore, jointly and severally liable to all Plaintiffs for these violations.

*29 U.S.C. § 1822(c): Violation of the terms of the working arrangement.* The AWPA prohibits an agricultural employer from violating the terms of the working arrangement with an employee without justification. 29 U.S.C. § 1822(c). There is no precise definition of "working arrangement" set forth in the statutes. The regulations promulgated by the Department of Labor, however, provide that an employer's failure to comply with the arrangement is justified if due to acts of God or to "conditions beyond the control of the person or to conditions which he could not reasonably foresee." The regulation also states that "[w]ritten agreements do not relieve any person of any responsibility that the person would otherwise have under the Act or these regulations." 29 C.F.R. § 500.72(a), (b). Thus, an employer cannot escape liability through a specific writing contrary to the responsibilities levied upon him by the Act. Nor, however, will he be held responsible for violations which arise under unforseen circumstances. The working arrangement, then,

is the understandings of the parties, given their mutual knowledge and conduct, as to the expected terms and conditions of employment.

In this case, Plaintiffs Arellano and Hernandez–Ramirez claim that their working arrangement with Kunkle Farms was violated when Defendant Felix assigned them to work in the tract of land being harvested by Felix' family. According to the Plaintiffs, each family's working arrangement was limited to harvesting the tract of land assigned to that family at the beginning of the workday.

The Plaintiffs testimony, however, indicates that the Plaintiffs understood the working arrangement to be otherwise. Plaintiffs Matias Aviles and Genaro Arellano Jr. testified that Defendant Felix often told the Plaintiffs to help his family harvest pickles, and that they had agreed. This testimony suggests that the Plaintiffs understood that Defendant Felix had the authority to assign each family to harvest other tracts of land. Additionally, Plaintiff Ofelia Arellano candidly testified that the families would often help each other finish their harvesting at the end of the day. The Court is not satisfied that there is a preponderance of evidence on this claim. Moreover, there is clearly no indication that the Kunkles were aware of any such job arrangement.

*29 U.S.C. § 1855(a): Retaliation activities prohibited under the AWPA.* Section 1855(a) prohibits retaliation against migrant workers who have exercised a right or protection afforded by the Act. 29 U.S.C. § 1855(a). Claims of retaliatory violations were brought on behalf all Plaintiffs against Kunkle Farms and Carlos Felix. Specifically, the Plaintiffs claim that the Defendants intimidated, threatened, fired and discriminated against them in retaliation for certain complaints made by the

---

**9.** Section 1821(a) only protects those migrants who were recruited by an agricultural employer, farm labor contractor or agricultural association. 29 U.S.C. § 1821(a). In this case, the Arellano family was recruited by Co–Plaintiff Antonio Hernandez–Ramirez, an employee under the Act. Hernandez–Ramirez, however, was given express authority to recruit other families

on behalf of Kunkle Farms by Defendant Felix the previous summer. It would be unfair to conclude that Kunkle Farms could benefit from these recruiting activities and yet escape the recruiting disclosure responsibilities levied by the Act. The Defendants are, thus, held accountable for violations of Section 1821(a) as to all Plaintiffs.

Plaintiffs regarding the working arrangement.

According to the testimony of the Plaintiffs, on the Saturday in question, Plaintiffs Arellano and Hernandez–Ramirez planned to quit work "early" to do other things. Defendant Felix insisted that they help harvest in the tract assigned to his family. When said Plaintiffs refused, they were fired. Donald Kunkle testified that these particular Plaintiffs were antagonistic toward Felix and that the problem arose because Felix was shorthanded due to an illness in his family.

In any event, it is clear that the Arellano and Hernandez–Ramirez families were evicted by Sunday morning following a confrontation with Felix. He either threatened to call, or did call, the police. By Sunday evening Donald Kunkle had asked them to come back to work, but they had refused.

Under the Act, the Plaintiffs must prove that the alleged retaliatory actions were taken by the Defendants because the Plaintiffs had protested a change in the working arrangement, thus exercising a "a protection" afforded by the AWPA. *Id.* The Court has concluded that the families would routinely help each other in the fields when they were so inclined or were directed to do so by Felix. It cannot be said that their refusal to help the Felix family on this particular Saturday was a protest of a change in the working arrangement. Nor can it be said that the motivating factor of the Plaintiffs discharge and eviction was the Plaintiffs' assertion of an AWPA right.

### AWPA Liquidated Damages

The AWPA provides plaintiffs with a choice of remedies if the court finds that the defendants' statutory violations were intentional. The court may award plaintiffs the amount of their actual damages, statutory damages up to $500.00 per plaintiff per violation, or other equitable relief. 29 U.S.C. § 1854(c)(1). Here, the Plaintiffs seek only statutory damages for the Defendants' violations of Section 1821(a), (b), (c) and (d) of the AWPA.

The issue of statutory damages under the Act is left to the discretion of the court. *Beliz,* 765 F.2d at 1332. Under 29 U.S.C. § 1854(c)(1), the Court may, but is not required to, award up to $500.00 for each violation of the plaintiffs' AWPA rights committed by the defendants. *Salazar–Calderon,* 765 F.2d at 1346; *Castillo,* 704 F.2d at 197 n. 37.

A court may award liquidated damages under § 1854(c)(1) even absent a showing of actual injury. *Alvarez v. Joan of Arc, Inc.,* 658 F.2d 1217, 1219 (7th Cir. 1981). This provision has a dual purpose. It allows the plaintiffs to recover for harm they have suffered even though they cannot prove actual injury, and it promotes compliance with the AWPA's requirements, thereby deterring future abuses. *See Beliz,* 765 F.2d at 1333.

In fixing damages, the Court must consider the following *Beliz* factors: (1) nature and persistence of the violations—including whether the violations are substantive or technical; (2) the extent of the defendants' culpability; (3) damage awards in similar cases; (4) the defendants' ability to prevent future violations of the AWPA and (5) the circumstances of each case. *Beliz,* 765 F.2d at 1332, 1333. *Id.*

In this case, the Defendants violated Section 1821(a), (b), (c) and (d) of the AWPA as to all plaintiffs. The *Beliz* factors must be applied to determine the amount of the statutory damages to be awarded:

(1) *nature and persistence of the violation.* The Section 1821(a) recruiting disclosure violation is not particularly serious since these Plaintiffs had worked at Kunkle Farms in 1982. Several of the Plaintiffs testified that they knew the terms and conditions of employment at the farm based upon their experiences the previous year. It can be presumed that they accepted employment for 1983 based upon this knowledge. Additionally, by custom, the work agreements were entered into by the father or husband on behalf of his family. The testimony indicated that the other

members of the family agreed to abide by his decision regardless of the terms and conditions of employment. Consequently, the absence of recruiting disclosures is not a violation which proved injurious to the Plaintiffs.

As to the Section 1821(b) violation, the posting requirement, there is no evidence that the required poster was available in the spring or summer of 1983. In fact, at least one District Court has concluded that the final regulation specifying the form for the poster was not published until August 23, 1983. *Bueno v. Mattner*, 633 F.Supp. 1446, 1465 (W.D.Mich.1986), *aff'd*, 829 F.2d 1380 (6th Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1994, 100 L.Ed.2d 226 (1988). Donald Kunkle testified that he was unaware of the Act until late summer and that he probably put up the poster at that time. As discussed previously, this was an intentional violation, but must be characterized as technical at best.

As for Defendants' Section 1823(c) violation, the Plaintiffs claim that they were harmed by the lack of knowledge that they would have to vacate their temporary housing on one-day's notice. It is difficult to conclude, however, that a written statement regarding this, or other occupancy conditions, would have deterred the Plaintiffs from returning in 1983 or prevented the controversy with Felix which prompted the Plaintiffs' early departure. The Court concludes that this violation is also technical in nature.

Defendants' Section 1821(d)(1) and (d)(2) violations, however, are more substantive than technical.[10] Defendant Kunkle testified that he did not keep or distribute the required wage information as to the cucumber harvest. The tomato wage-and-hour records also proved inadequate. Although these omissions resulted in part from ignorance of the statute, and from a mistaken belief that certain harvesters were independent contractors, these violations are particularly significant. Without tangible evidence of wage recordkeeping information,

the Plaintiff is at a considerable disadvantage to show the duration of employment and the compensation earned. He may also be unable to prove actual damages under the Act.

(2) *Defendants' culpability.* It cannot be said that the Defendants began the season without making any effort to comply with the AWPA since they were unaware of the Act. Nor can it be said that the evidence proved that the Defendants are likely to violate the AWPA in the future unless some massive deterrent award is levied. These violations resulted not from an abusive disregard for the Plaintiffs' rights, but from ignorance and misconceptions as to the state of the law.

(3) *Damage awards in similar cases.* In other cases involving AWPA notice provisions, and its predecessor the FLCRA, awards have varied widely depending upon the application of other *Beliz* factors. Fifth Circuit awards have varied from a low of $15.00 per violation to the maximum of $500.00. *Compare Salazar–Calderon*, 765 F.2d at 1347–48 *with Montelongo v. Meese*, 803 F.2d 1341, 1350 (5th Cir.1986), *cert. denied sub nom., Martin v. Montelongo*, 481 U.S. 1048, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987). The maximum of $500.00 is not, however, the norm. Nor is it usual for the employer to be assessed damages in the hundred thousand dollar range. This is especially true when the plaintiffs are many and the violations are few or technical. *See Beliz*, 765 F.2d at 1317 (16 plaintiffs, awarded $50.00 per violation for 10 violations, total award of $8,000); *Salazar–Calderon*, 765 F.2d at 1347 (over 150 plaintiffs, awarded $15.00 per violation for 5 violations, total award of $11,250); *see also Bueno*, 633 F.Supp. at 1468 (32 plaintiffs, awarded $75.00 per violation for 4 violations, total award of $9,600); *Washington v. Miller*, 721 F.2d 797 (11th Cir.1983) (6 plaintiffs, awarded $500.00 per violation for 6 violations, total award of $18,000); *Alvarez v. Joan of Arc*,

---

**10.** These violations involve "multiple infractions" of a single provision of the Act which "constitute only one violation for purposes of determining the amount of statutory damages

due a plaintiff." 29 U.S.C. § 1854(c)(1)(A). Each Plaintiff is, thus, limited to a maximum recovery of $500.00 for Section 1821(d) violations.

*Inc.*, 658 F.2d 1217 (7th Cir.1981) (300 plaintiffs, awarded $100 per violation for 1 violation, total award $30,000); *De la Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225 (7th Cir.1983) ($100.00 per worker, per season, total award of $115,000).

(4) *Defendants' ability to prevent future violations.* There is nothing in the record which would indicate that the Defendants are unwilling to comply with Section 1821(a), (b), (c) or (d) in the future. Nor is there evidence of a bar, financial or otherwise, which would prevent Kunkle Farms from obtaining and posting the necessary disclosures.

(5) *The circumstances of this litigation.* In this case there are more than a few plaintiffs (18), the violations are several (4), and the total possible award is unreasonably excessive ($36,000) when viewed against other awards for mostly technical violations. The Defendants' culpability level was not such that excessive damages should be awarded to punish and deter future violations. An award of $25.00 per plaintiff, per violation, for violations of Section 1821(a), and (b), and $50.00 per Plaintiff for the violation of Section 1821(c), and $250.00 per Plaintiff for the violation of Section 1821(d), or a total award of $6,300.00, will compensate the Plaintiffs without placing too great a burden on the Defendants.

### FLSA Violations

▮ The FLSA required Defendants Kunkle to have paid the Plaintiff employees a minimum wage of $3.35 per hour during the 1983 pickle and tomato harvests. 29 U.S.C. § 206(a)(1) (1978).[11] Thus, although the Defendants paid the Plaintiffs on a piece rate or percentage basis, they had to ensure that the Plaintiffs' piece rate and percentage wage equaled the minimum wage.[12] Before determining the minimum wage claims of the individual Plaintiffs, however, the parties' burdens of proof must be addressed.

▮ As in a normal civil case, the Plaintiffs must establish their entitlement to relief under the FLSA by a preponderance of the evidence. The Supreme Court, however, has established guidelines for shifting the burden of proof in minimum wage cases. *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 1191–92, 90 L.Ed. 1515 (1946). When an employer has kept proper and accurate records, an employee may discharge his burden of proof by producing these records. Where the employer's records are inaccurate or inadequate, and the employee has no credible substitutes, an employee has carried his burden if he proves "that he has in fact performed work for which he was improperly compensated." He must produce sufficient evidence to show "the amount and extent of that work as a matter of just and reasonable inference." The burden then shifts to the defendant employer to come forward with evidence of the exact amount of work performed or with evidence to negate the reasonableness of the inference drawn from the employee's evidence. If the employer fails to produce

---

**11.** Defendants Kunkle contend that Kunkle Farms was exempt from the FLSA minimum wage requirement pursuant to 29 U.S.C. § 213(a)(6) in their Proposed Findings of Fact and Conclusions of Law. This section exempts employees who (1) are employed in agriculture as hand-harvest laborers paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis of employment, (2) commute daily from a permanent residence to the farm on which they are so employed, and (3) have been employed in agriculture less than 13 weeks during the preceding calendar year. *Id.* § 213(a)(6)(C)(i), (ii), (iii). This exemption is intended to apply to the local worker who goes out on a temporary basis during the season to harvest crops. It is not intended to apply to one who earns a living at farmworking or to migrant laborers, such as the Plaintiffs, who travel from farm to farm. 29 C.F.R. § 780.310.

**12.** The FLSA also required the Defendants to prepare and maintain records documenting, among other things, the hours each Plaintiff worked and the Plaintiffs' starting and stopping times. The FLSA, however, contains no private enforcement mechanism if the employer fails to maintain such records. 29 C.F.R. §§ 516.-2(a)(7), 516.6(a)(1). Although the Plaintiffs could not sue Defendants Kunkle for this violation, such failure did expose the Defendants to liability under the FLSA's minimum wage provisions. *Castillo*, 704 F.2d at 198 n. 41. Moreover, as discussed previously, Section 1821(d) of the AWPA contains an analogous requirement that provided a basis for recovery. 29 U.S.C. § 1821(d).

this evidence, the court may then award damages to the employee, "even though the result be only approximate." The employer cannot complain that the "damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements" of the FLSA. *Id.*, 66 S.Ct. at 1191; *see also Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 419–20 (5th Cir. 1975); *Beliz*, 765 F.2d at 1330, n. 55.

Initially, then, this Court must determine whether Defendants Kunkle failed to keep accurate or adequate records. Section 1821(d) of the AWPA provides that employers must maintain the following records for each migrant worker, including the name, permanent address, and Social Security number: the basis on which wages are paid; the number of piecework units earned, if paid on a piecework basis; the number of hours worked; the total pay period earnings; the specific sums withheld and the purpose of each sum withheld; and the net pay. 29 U.S.C. § 1821(d); *see also* 29 C.F.R. § 516.2 (requirements under the FLSA). Such records were not kept by Defendants Kunkle[13]. They did not, among other things, keep separate wage records for each employee, mark the exact hours of work for each employee, or provide the net pay for each employee in the pickle harvest. Kunkle Farms' wage statements were, thus, inadequate as to the 1983 harvest.

▪ The Court must then determine whether the Plaintiffs demonstrated that they performed work for which they were improperly compensated, and if so, whether the evidence allows the Court to determine the amount and extent of that work as a matter of just and reasonable inference. *Anderson*, 66 S.Ct. at 1192. Provided the Plaintiffs meet this burden, the Court must ultimately determine whether Defendants Kunkle introduced other evidence establish-

ing the precise amount of work the Plaintiffs performed or rebutting the inference drawn from their evidence. *Id.* With respect to the tomato harvest, the Defendants kept time records (PX–9) and the Plaintiffs are apparently content to base their claims on those records. There were no records kept on the pickle harvest, so the Court must attempt to reconstruct records from the evidence.

The Plaintiffs consistently testified that each family began work early in the morning and worked into the early evening, taking a short lunch break. Starting time each workday was set by each family crew, but stopping time depended upon completion of work in the field assigned that workday. Representative family members testified to the amount of hours that each family member worked per day, since the families generally worked the same hours and everyone was in the pickle fields together.[14] Defendants Kunkle were unable to produce evidence either establishing the total hours Plaintiffs' worked or rebutting the inferences to be drawn from the Plaintiffs' testimony. The Court concludes that the Plaintiffs satisfactorily established in reasonable probability the number of hours the Plaintiffs worked in the pickle fields. Those hours are reflected in the calculations set forth hereafter.

### Plaintiffs Aviles

Name: Matias, Ramona, Consuelo, Adrian, Irma, Juana Maria, Jose and Dora.

Crop: pickle

workweek: 7/23 through 7/28

7 members of the Aviles family worked 10 per hours per day for 6 days, or 420 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,407.00. Kunkle Farms paid them $295.01, or $.70 per hour. Defendants owe Plaintiffs Aviles $1,111.99 unpaid minimum wages, or $158.85 each.

---

**13.** As discussed *infra,* Defendants Kunkle have been found liable for these violations under the AWPA.

**14.** In FLSA cases, some plaintiffs can testify as to hours that other, non-testifying, plaintiffs

worked if they have personal knowledge of such hours. *Beliz,* 765 F.2d at 1331; *Castillo,* 704 F.2d at 195.

workweek: 7/29 through 8/04

7 members of the Aviles family worked 10 hours per day for 7 days, or 490 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,641.50. Kunkle Farms paid them $820.44, or $1.67 per hour. Defendants owe Plaintiffs Aviles $821.06 unpaid minimum wages, or $117.29 each.

workweek: 8/05 through 8/11

7 members of the Aviles family worked 10 hours per day for 7 days, or 490 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,641.50. Kunkle Farms paid them $1,066.22, or $2.18 per hour. Defendants owe Plaintiffs Aviles $575.28 unpaid minimum wages, or $82.18 each.

workweek: 8/12 through 8/18

7 members of the Aviles family worked 10 hours per day for 7 days, or 490 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,641.50. Kunkle Farms paid them $926.72, or $1.89 per hour. Defendants owe Plaintiffs Aviles $714.78 unpaid minimum wages, or $102.11 each.

workweek: 8/19 through 8/25

8 members of the Aviles family worked 10 hours per day for 7 days, or a total of 560 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,876.00. Kunkle Farms paid them $703.91, or $1.26 per hour. Defendants owe Plaintiffs Aviles $1,172.09 unpaid minimum wages, or $146.51 each.

workweek: 8/26 through 9/01

8 members of the Aviles family worked 10 hours per day for 7 days, or a total of 560 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,876.00. Kunkle Farms paid them $692.69, or $1.24 per hour. Defendants owe Plaintiffs Aviles $1,183.31 unpaid minimum wages, or $147.91 each.

workweek: 9/02

8 members of the Aviles family worked 10 hours per day for 1 day, or a total of 80 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received

$268.00. Kunkle Farms paid them $121.55, or $1.52 per hour. The Defendants owe Plaintiffs Aviles $146.45 unpaid minimum wages, or $18.30 each.

In those workweeks set out above where only 7 workers appear, the named Plaintiff excluded from the family crew is Juana Maria Aviles. Accordingly, the Defendants owe each member of the Aviles family crew $773.15 in minimum wages, with the exception of Juana Maria Aviles, who is entitled to recover $312.72 in back wages.

### Plaintiffs Arellano

Names: Genaro Sr., Genaro Jr., Ofelia, Reymundo, Lucila and Guadalupe

Crop: pickle

workweek: 7/23 through 7/28

6 members of the Arellano family worked 11 hours per day for 6 days, or a total of 396 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $1,326.60. Kunkle Farms paid them $394.31, or $1.00 per hour. The Defendants owe Plaintiffs Arellano $932.29 unpaid minimum wages, or $155.38 each.

workweek: 7/29 through 8/4

6 members of the Arellano family worked 11 hours per day for 7 days, or a total of 462 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $1,547.70. Kunkle Farms paid them $950.14, or $2.06 per hour. The Defendants owe Plaintiffs Arellano $597.56 in unpaid minimum wages, or $99.59 each.

workweek: 8/05 through 8/11

6 members of the Arellano family worked 11 hours per day for 7 days, or a total of 462 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $1,547.70. Kunkle Farms paid them $1,090.95, or $2.36 per hour. The Defendants owe Plaintiffs Arellano $456.75 in unpaid minimum wages, or $76.12 each.

workweek: 8/12 through 8/18

6 members of the Arellano family worked 11 hours per day for 7 days, or a total of 462 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $1,547.70. Kunkle Farms paid them

$966.02, or $2.09 per hour. The Defendants owe Plaintiffs Arellano $581.68 in unpaid minimum wages, or $96.94 each.

workweek: 8/19 through 8/25

6 members of the Arellano family worked 11 hours per day for 7 days, or a total of 462 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $1,547.70. Kunkle Farms paid them $760.13, or $1.65 per hour. The Defendants owe Plaintiffs Arellano $787.57 in unpaid minimum wages, or $131.26 each.

workweek: 8/26 through 8/27

6 members of the Arellano family worked 11 hours per day for 2 days, or a total of 132 hours for the week. At $3.35 per hour, Plaintiffs Arellano should have received $442.20. Kunkle Farms paid them $204.56, or $1.55 per hour. The Defendants owe Plaintiffs Arellano $237.64 in unpaid minimum wages, or $39.60 each.

For the workweeks set out above, the Defendants owe each member of the Arellano family crew $598.89 in unpaid minimum wages.

*Plaintiffs Hernandez–Ramirez*

Names: Antonio, Alicia, Homero and Evarista

Crop: pickle

workweek: 7/23 through 7/28

4 members of the Hernandez–Ramirez family worked 11 hours per day for 6 days, or a total of 264 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $884.40. Kunkle Farms paid them $247.43, or $.94 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $636.97 in minimum wages, or $159.24 each.

workweek: 7/29 through 8/04

4 members of the Hernandez–Ramirez family worked 11 hours per day for 7 days, or a total of 308 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $1,031.80. Kunkle Farms paid them $657.83, or $2.14 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $373.97 in unpaid minimum wages, or $93.49 each.

workweek: 8/05 through 8/11

4 members of the Hernandez–Ramirez family worked 11 hours per day for 7 days, or a total of 308 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $1,031.80. Kunkle Farms paid them $767.51, or $2.49 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $264.29 in unpaid minimum wages, or $66.07 each.

workweek: 8/12 through 8/18

4 members of the Hernandez–Ramirez family worked 11 hours per day for 7 days, or a total of 308 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $1,031.80. Kunkle Farms paid them $660.05, or $2.14 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $371.75 in unpaid minimum wages, or $92.93 each.

workweek: 8/19 through 8/25

4 members of the Hernandez–Ramirez family worked 11 hours per day for 7 days, or a total of 308 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $1,031.80. The Defendants paid them $518.66, or $1.68 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $513.14 in unpaid minimum wages, or $128.28 each.

workweek: 8/26 through 8/27

4 members of the Hernandez–Ramirez family worked 11 hours per day for 2 days, or a total of 88 hours for the week. At $3.35 per hour, Plaintiffs Hernandez–Ramirez should have received $294.80. Kunkle Farms paid them $149.30, or $1.70 per hour. The Defendants owe Plaintiffs Hernandez–Ramirez $145.50 in unpaid minimum wages, or $36.37 each.

For the workweeks set out above, the Defendants owe each Plaintiff member of the Hernandez–Ramirez family crew $576.38 in unpaid minimum wages.

*Plaintiffs Aviles*

Name: Matias, Ramona, Consuelo, Adrian, Irma, Juana Maria, Jose and Dora

Crop: tomato

workweek: 9/05 through 9/09

8 members of the Aviles family worked 8 hours per day for 4 days, or a total of 256 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $857.60. Kunkle Farms paid them $682.50, or $2.67 per hour. The Defendants owe Plaintiffs Aviles $175.10 in unpaid minimum wages, or $21.88 each.

workweek: 9/10 through 9/16

8 members of the Aviles family worked 8 hours per day for 7 days, or a total of 448 hours for the week. At $3.35 per hour, Plaintiffs Aviles should have received $1,500.80. Kunkle Farms paid them $680.94 or $1.52 per hour. The Defendants owe Plaintiffs Aviles $819.86 in unpaid minimum wages, or $102.48 each.

workweek: 9/19 through 9/23

8 members of the Aviles family worked 8 hours per day for 5 days, or a total of 320 hours. At $3.35 per hour, Plaintiffs Aviles should have received $1,072.00. Kunkle Farms paid them $514.54, or $1.61 per hour. The Defendants owe Plaintiffs Aviles $557.46 in unpaid minimum wages, or $69.68 each.

workweek: 9/24 through 9/30

8 members of the Aviles family worked 8 hours per day for 6 days, or a total of 384 hours. At $3.35 per hour, Plaintiffs Aviles should have received $1,286.40. Kunkle Farms paid them $737.10 or $1.92 per hour. The Defendants owe Plaintiffs Aviles $549.30 in unpaid minimum wages, or $68.66 each.

workweek: 10/01 through 10/05

8 members of the Aviles family worked 8 hours per day for 4 days, or a total of 256 hours. At $3.35 per hour, Plaintiffs Aviles should have received $857.60. Kunkle Farms paid them $750.37, or $2.93 per hour. The Defendants owe Plaintiffs Aviles $107.23 in unpaid minimum wages, or $13.40 each.

For the workweeks set out above, the Defendants owe each member of the Aviles family crew $276.10 in unpaid minimum wages in the tomato crop. This amount, added to the $773.15 owed to each Plaintiff from the pickle crop, brings the total unpaid minimum wages owed to each member of the Aviles family to $1,049.25, with the exception of Juana Maria Aviles, who is owed a total of $588.82 in unpaid minimum wages.

### FLSA Liquidated Damages

Having found that Defendants Kunkle did not pay the Plaintiffs minimum wages during the 1983 harvest, the Court must now determine whether the Plaintiffs can recover an additional sum equal to the amount of their unpaid minimum wages as liquidated damages. 29 U.S.C. § 216(b).

Section 216(b) of the FLSA states in part: "[a]ny employer who violates section 206 or 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensations, as the case may be, and in additional equal amount as liquidated damages." *Id.*

Section 260 of the same title provides: "[i]n any action commenced ... to recover unpaid minimum wages ... or liquidated damages ... if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title." *Id.* § 260.

For the Court's discretion to be invoked, however, the delinquent employer must sustain the "substantial burden" of persuading the trial court that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict. *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir.1990) (employer has dual burden of proving good faith and reasonable grounds for not complying with FLSA). In the absence of this proof, a District Court has no power or discretion to reduce an employer's liability below double unpaid wages. *See Id.*

An employer cannot satisfy this dual burden under Section 260 by professing ignorance of the requirements of the Act. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 468–69 (5th Cir.1979); *see also Cox v. Brookshire Grocery Co.*, 919 f.2d 354, 357 (5th Cir.1990). Good faith requires some duty to investigate liability under the FLSA. *Barcellona*, 597 F.2d at 469. In this case, Defendants Kunkle did not attempt to comply with the FLSA as to the pickle harvesters. At trial, Donald Kunkle testified that he classified these workers as independent contractors according to a 6th Circuit decision. However, that decision was not released until one year after the 1983 harvest. *Donovan v. Brandel, supra.* In fact, at least one District Court in Ohio had previously classified pickle harvesters as employees. *Donovan v. Gillmor, supra.* Since Defendants Kunkle cannot claim that they were ignorant that the FLSA applied to the pickle harvesters, or prove that they made a responsible investigation into their duties under the labor laws, they have not satisfied their burden under Section 260. The Court must therefore impose liquidated damages as follows:

| No. & Name of Plaintiffs | unpaid min. wages each | liquidated damages each | total award each |
|---|---|---|---|
| (7) Aviles [15] | $1,049.25 | $1,049.25 | $2,098.50 |
| (4) Hernandez–Ramirez | $ 576.38 | $ 576.38 | $1,152.76 |
| (6) Arellano | $ 598.89 | $ 598.89 | $1,197.78 |

### Conclusion

Defendants Kunkle are jointly and severally liable to all Plaintiffs for violations of Sections 1821(a), (b), (c) and (d) of the AWPA. 29 U.S.C. § 1821(a), (b), (c), (d). Plaintiffs only sought damages against Defendant Felix for violating 29 U.S.C. § 1855(a). The Court has denied recovery on this claim. Defendants Kunkle are jointly and severally liable to all Plaintiffs for unpaid minimum wages, and liquidated damages in an equal amount, under the FLSA. 29 U.S.C. §§ 216(b), 260. The amount of damages is summarized as follows:

| NAME OF PLAINTIFF | AWPA § 1821(a) | AWPA § 1821(b) | AWPA § 1821(c) | AWPA § 1821(d) | TOTAL FLSA AWARD | TOTAL |
|---|---|---|---|---|---|---|
| Aviles | | | | | | |
| Matias | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Ramona | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Adrian | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Consuelo | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Jose | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Irma | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Dora | $25.00 | $25.00 | $50.00 | $250.00 | $2,098.50 | $ 2,448.50 |
| Juana Maria | $25.00 | $25.00 | $50.00 | $250.00 | $1,177.70 | $ 1,527.64 |
| | | | | | | $18,667.14 |
| Hernandez–Ramirez | | | | | | |
| Antonio | $25.00 | $25.00 | $50.00 | $250.00 | $1,152.76 | $ 1,502.76 |
| Alicia | $25.00 | $25.00 | $50.00 | $250.00 | $1,152.76 | $ 1,502.76 |
| Homero | $25.00 | $25.00 | $50.00 | $250.00 | $1,152.76 | $ 1,502.76 |
| Evarista | $25.00 | $25.00 | $50.00 | $250.00 | $1,152.76 | $ 1,502.76 |
| | | | | | | $ 6,011.04 |

Total Award

**15.** With the exception of Juana Maria Aviles who will be awarded $588.82 in minimum wages, and $588.82 in liquidated damages, for a total award of $1,177.64.